CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 16 2015

JULIA C. DUDLEY, CLERK
BY
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JUSTIN D. THOMAS and <br> IRENE S. THOMAS, <br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> CARMEUSE LIME & STONE, INC., <br> and O-N MINERALS (CHEMSTONE) <br> COMPANY, <br> Defendants/Crossclaim Defendants, <br><br> v. <br><br> THOMAS M. HELMS, SR., <br> Intervenor Defendant/ <br> Counterclaimant/Crossclaimant. | Case No.: 7:12-cv-00413-GEC <br><br> **MEMORANDUM OPINION** <br><br> Hon. Glen E. Conrad <br> Chief United States District Judge |

Pending before the court are four motions for summary judgment or partial summary judgment, all of which have been fully briefed and were argued before the court at an October 16, 2014 hearing. Two related motions by plaintiffs (in which they seek to exclude the opinions of certain experts offered by defendant Carmeuse) have also been fully briefed and argument on them waived. The court has carefully considered the submissions of the parties, the arguments of counsel, and the applicable law. The court's conclusions are set forth herein.

### Factual and Procedural Background[1]

This case concerns a dispute between the parties regarding which of them owns what portion of the mineral estate on a piece of property where the surface estate is owned by the

---

[1] The parcels of land at issue in this case are irregularly shaped and not positioned in any clear direction (such as due north and south). To assist the reader in understanding the geography of this area and the parties' arguments, this opinion includes several documents from the summary judgment record as appendices. By including and referring to those documents, the court does not adopt them, nor does the court conclude that every word or description on them is accurate. Instead, they are simply visual representations to be used as general aids.

plaintiffs, Justin and Irene Thomas. The parcel of land at issue ("the Property" or "the Thomas Property") consists of approximately 150 acres in Botetourt County, Virginia.[2] The mineral estate consists of ownership of the stone (including limestone) and related quarrying rights.

On the northwestern portion of the Property is an old stone house, which, according to one of plaintiffs' experts, "is an excellent, and rare, example of 18th century colonial American architecture." Dkt. No. 168-3 at 2. Although plaintiffs purchased the property in 2002, they have never lived in the home, and no one currently resides in the home. Apparently it has not been occupied since 1999. Mr. Thomas, who lives with his family in Ohio, contends that he continues to "make frequent trips to the property, using it for recreational purposes," Dkt. No. 168 at 11, although his deposition testimony on this issue is less than clear. He states that he currently "inhabits" the house, and that at least two of his children have stayed at the property overnight. Dkt. No. 168-1, Thomas Dep. at 45-46. He acknowledges that there is no plumbing or sewage, only an outhouse, and that although the house was wired for electricity when he purchased it, the house does not have electricity currently. Id. at 29-30, 46, 146. Additionally, under current zoning regulations, the house cannot be occupied. Dkt. No. 195 at 10; Dkt. No. 168 at 41. Because no part of the Thomas Property is zoned for residential use, Dkt. No. 168-1 at 107, Carmeuse contends the house is "unoccupiable." Dkt. No. 143 at 32.

On the northern border of the Thomas Property is land owned in fee simple by Carmeuse,[3] on which Carmeuse operates an existing limestone quarry. Bordering the property on

---

[2] The exact acreage of the property, identified by as plot (M)43-22 on the Botetourt County Tax Map, has at times been disputed in the course of these proceedings, although the dispute is not relevant here. According to the survey by Dorsey Surveyors dated August 30, 2013, the acreage of Parcel A, which is deeded to the Thomases, is 148.35 acres. See Appendix 2.

[3] The court and the parties have used "Carmeuse" in the case to refer collectively to both defendants, although they are distinct entities. Carmeuse Lime & Stone, Inc. owns and operates a limestone mining plant that is adjacent to plaintiffs' property. Defendant O-N Minerals (Chemstone) Company is a wholly-owned subsidiary of Carmeuse Lime & Stone and the entity that actually holds the title to some portion of the stone on plaintiffs'

2

the south is property owned by persons not parties to this lawsuit, and south of those properties,

intervenor Thomas M. Helms. Sr. owns a parcel of land in fee simple. See Appendix 1, docketed

as Dkt. No. 171-1 at 27 (composite map dated September 3, 2013 drawn by McMurry Surveyors,

Inc., which shows generally land owned by Helms, Thomas, and by Carmeuse (described

thereon as Rocky Point Farm)); see also Appendix 2, docketed as Dkt. No. 94 at 2 (surveyor's

plat map by Dorsey Surveyors dated August 30, 2013) (showing additional detail).

On the Thomas Property (and going through the neighboring properties), several "veins"

of limestone, some of it high-grade limestone suitable for industrial uses, run in the general

direction from northeast of the Property in a southwesterly direction. See Appendix 2; Appendix

3, docketed as Dkt. No. 143-3 at 11. (Figure 5-1 from the report of Carmeuse's proffered expert,

Hans Naumann, showing the geological features of the area as mapped in 1967). The property is

in an area of the county which has been known to be rich in limestone since at least the mid-

1800s, and a number of abandoned quarries are in the vicinity. The scope and size of Carmeuse's

current quarry, however, far exceeds the size and scope of any abandoned quarries. See

Appendix 3 (showing small "abandoned quarries" and Carmeuse's current quarry); Appendix 4,

docketed as Dkt. No. 168-29 at 19 (Figure 7-3 from Naumann's report, showing an aerial

photograph depicting locations and sizes of historic quarries and Carmeuse's quarry).

Plaintiffs filed this declaratory judgment action after receiving a letter from Carmeuse's

attorney in June 2012, in which he explained that Carmeuse would be conducting core drilling on

the Property and in which he made a reference to Carmeuse's right to "destroy and disturb the

---

property. In keeping with the convention and particularly with the court's practice in prior orders, see, e.g., Dkt. No. 38, at 2 n.3, "Carmeuse" herein refers collectively to both defendants, unless otherwise noted.

3

surface to allow the [Carmeuse] to extract the limestone." Dkt. No. 1-7 at 1.[4] After the court

denied plaintiffs' request for a temporary restraining order, the core drilling took place, although

no quarrying has occurred on the Property since the Thomases purchased it.

Plaintiffs have since dismissed their request for injunctive relief. Instead, the amended

complaint asks for various declaratory judgments as to the respective property rights of the

parties. After some preliminary title work had begun, plaintiffs subsequently moved to add

Thomas Helms as a party, and ultimately, Helms retained counsel and elected to join this lawsuit,

asserting both a counterclaim against plaintiffs and a cross-claim against Carmeuse.

Without going into unnecessary detail concerning each party's chain of title, the court

focuses on a few key points that are undisputed. First, the Thomas Property is part of a 200 acre

parcel that was owned by Reynolds in the mid-1800s, the same parcel that was subsequently

owned by other parties and is referred to in certain documents as being owned by Pitzer, Webster

or Alphin. Dkt. No. 143 at 2-3, ¶ 2. In an 1849 deed (the "1849 Deed" or the "Severance

Deed"),[5] Reynolds conveyed ownership of the limestone and other stone on his property to John

S. Wilson, thereby creating two estates in the same parcel of land, the surface estate and the

mineral estate. See Bostic v. Bostic, 99 S.E.2d 591, 594 (Va. 1957) (explaining that an owner

may convey the underlying minerals and except from the operation of the conveyance the surface

of the land, which severs the mineral estate from the surface estate and creates two separate

---

[4] The Thomases also previously filed a quiet title action related to the same property. Although that suit, and the parties' respective actions with regard to it, have been the subject of much consternation in the instant case, the suit was ultimately nonsuited, and has no bearing on the issues presently before the court.

[5] The deed is dated 1849, but was not recorded until 1851 in the Office of the Clerk of the Circuit Court for Botetourt County, Virginia in Deed Book 31, page 271. Thus, although the parties are not consistent as to the date (and refer to it by different dates), it is undisputed that all parties are referencing the same severance deed in their filings. To remain consistent with prior opinions by Judge Turk, who was assigned to this case from its inception until his death in July 2014, the court also utilizes the 1849 date.

estates). Thus, any claims of ownership of that stone and the related quarrying rights on the Property, such as those now asserted by Carmeuse and Helms, trace back to the 1849 Deed.

The plaintiffs' chain of title forward through today is not the subject of any dispute here. The only point of note is that plaintiffs do not own the entirety of the surface estate that Reynolds retained after the 1849 Deed. Instead, a portion of that 200-acre tract was sold after 1992 and a portion of it on the northeast side of Route 622 was outconveyed to Eubank. Dkt. No. 194-3 at 13, ¶ 4.[6]

The extent of Helms' and Carmeuse's interest in the mineral estate will turn, to a large degree, on two related deeds from 1901 and 1902 and on two deeds from 1992. Each of these and their significance will be discussed in more detail in context below. There are other deeds and leases of mineral rights in each party's chain of title, but they are largely immaterial to the issues before the court, and will be discussed in context below only as necessary to understand the parties' arguments.

As noted, there are four motions for partial summary judgment or for summary judgment pending. In each of them, the filer requests specific rulings as to the meaning of various deeds or provisions in a deed, and a declaration concerning the ownership interests of the mineral estate of the Thomas Property. The parties have filed more than a thousand pages of briefing on the summary judgment motions and the related motions to exclude certain expert testimony, but the legal issues in this case are relatively straightforward. As to the property interests at stake, there are essentially four main disputes.

---

[6] The relevance of this fact, as explained by plaintiffs' expert, is that any measurement from the northern division line referenced in the 1992 Deeds must begin not at the current boundary of the Thomas Property, but "instead from the old boundaries referenced in the 1992 James River Deed, which are inclusive of the Eubank out conveyance." Dkt. No. 194-3 at 13-14, ¶ 4.

5

First, the parties dispute the meaning and consequences of a provision in the 1849 Deed referred to in prior court opinions as the "Yard Restriction." Plaintiffs contend that this provision in the 1849 Deed prohibits the owner or owners of the mineral estate from quarrying limestone within the enclosure of the "yard," which is some disputed and uncertain amount of land around what was the Reynolds' dwelling house.[7]

Second, the parties interpret differently two deeds recorded in 1901 and 1902. According to Carmeuse and Helms, these two deeds conveyed the entirety of Wilson's estate (which included both property in fee simple north and south of the Thomas parcel and all of the mineral estate conveyed by Reynolds in 1849). According to the Thomases, the plain language of these two deeds conveyed only a portion of the mineral estate and the rest (the portion not conveyed) reverted by operation of law back to the original owners and thus is now owned by plaintiffs. Thus, according to plaintiffs, Carmeuse and Helms own substantially less of the mineral or limestone rights than the defendants contend.

Third, the parties dispute the meaning of two 1992 deeds, one in Carmeuse's chain of title and one in Helms' chain of title. This dispute is primarily one between Carmeuse and Helms over how to divide their respective interests in the mineral estate, although plaintiffs have also weighed in and aligned themselves with Helms' interests. That is, although plaintiffs' expert has opined that the deeds are not clear as to what interest is conveyed to Helms, plaintiffs and Helms do agree that, as to the division of the mineral estate between Carmeuse and Helms, Helms owns far more than Carmeuse claims.

---

[7] Carmeuse has proffered expert testimony to support its assertion that the existing stone house on the property is not (or may not be) the Reynolds' dwelling house, and plaintiffs have moved to exclude that testimony on a number of grounds. The parties' submissions also devote a number of pages to this issue, including referencing maps drawn by civil war soldiers to support their respective positions. In light of the court's ruling herein that the Yard Restriction is not enforceable as plaintiffs urge, this dispute does not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

The fourth issue arises from plaintiffs' request for a ruling precluding the owners of the mineral estate from using modern mining or quarrying techniques to extract their stone, on the grounds that such techniques were not contemplated by Wilson or Reynolds, the original parties to the 1849 Deed. Defendants counter than neither the 1849 Deed nor Virginia law places any restriction on the methods or technology that the mineral estate owner may use to obtain the stone it owns.

## Discussion

**Summary Judgment**

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. Id. at 255.

Although the parties have submitted expert testimony addressing many of the issues in the case (and testimony that often conflicts), the court concludes that much of that testimony is not helpful to the issues before the court, which involve the legal interpretation and significance of the pertinent deeds. Thus, these competing opinions between the experts do not preclude the court ruling as a matter of law on these issues of deed interpretation. See Sun Yung Lee v. Clarendon, 453 F. App'x 270, 278 (4th Cir. 2011) (holding that district court did not abuse its discretion in refusing to consider certain expert reports that provided opinions on questions of

7

law in property dispute and noting that where the court sits as the trier of fact, it is in the "best position to know whether expert testimony would help [it]") (citation omitted). Similarly, the fact that the court finds several of the deeds ambiguous and looks to extrinsic evidence to interpret them does not preclude the entry of summary judgment. See, e.g., World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992) (in contract interpretation case, summary judgment may be granted even where the contract is ambiguous and requires examination of extrinsic evidence, so long as the "evidence is, as a matter of law, dispositive of the interpretative issue").

**Choice of Law**

The parties all agree that Virginia law governs this case. Where a federal court's jurisdiction is based on diversity, it must apply the forum state's substantive law, including its choice of law rules. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under Virginia law, cases involving disputes related to real property "are to be governed by the law of the place where the property is situated." Mort v. Jones, 51 S.E. 220, 221 (Va. 1905).

**General Principles of Deed Construction**

Relevant to at least the first three issues are the general rules of construction for analyzing deeds. The Supreme Court of Virginia has recently clarified these principles and they are worth stating in detail. First,

> [w]here the language of a deed clearly and unambiguously expresses the intention of the parties, no rules of construction should be used to defeat that intention. Where, however, the language is obscure and doubtful, it is frequently helpful to consider the surrounding circumstances and probable motives of the parties. Harris v. Scott, 179 Va. 102, 108, 18 S.E.2d 305, 307 (1942); Schultz v. Carter, 153 Va. 730, 734, 151 S.E. 130, 131 (1930).

8

CNX Gas Co. LLC v. Rasnake, 752 S.E.2d 865, 867 (Va. 2014). Thus, the court's consideration is "initially confine[d] to the four corners of the . . . deed to ascertain whether its language . . . is plain and unambiguous." Id. "Ambiguity" is defined as "the condition of admitting of two or more meanings, of being understood in more than one way." Id. (quoting Berry v. Kinger, 300 S.E.2d 792, 796 (Va. 1983)).

If there is ambiguity, then the court may go outside the four corners of the deed and, at that point, is aided by a number of well-established rules of construction. These include that:

(1) "the language must be construed against the grantor and in favor of the grantee," id. (citing Ellis v. Comm'r, 142 S.E.2d 531, 536 (Va. 1965)), which includes the rule that the "grantor must be considered to have intended to convey all that the language he has employed is capable of passing to his grantee." Id. (citing Hamlin v. Pandapas, 90 S.E.2d 829, 833 (Va. 1956));

(2) "[t]he whole of a deed and all its parts should be considered together [and] [e]ffect should be given to every part of the instrument, if possible . . ." id. (citing Auerbach v. Cnty. of Hanover, 478 S.E.2d 100, 102 (Va. 1996)); and

(3) the court must apply the modern rule of repugnancy, which requires that "the intent of the parties, *where clearly and unequivocally expressed*," be given effect, but when "it is impossible to discover with reasonable certainty the parties' intent from the language of the deed, the common law rule still applies and the granting clause prevails." Id. at 868 (emphasis in original) (citing Goodson v. Capehart, 349 S.E.2d 130, 133 (Va. 1986)).

Keeping these principles in mind, the court turns to the interpretation of the disputed deeds.

**The Validity and Enforceability of the "Yard Restriction" in the 1849 Deed**

The first issue is whether the "Yard Restriction" in the 1849 Deed restricts the mineral estate owners from mining stone or from any quarrying activities in the area of the Yard, however that area is defined.[8] It is undisputed that the 1849 Deed is the beginning of any claim by both Carmeuse and Helms to any mineral estate on the Property and that their ownership

---

[8] The parties' experts disagree as to how large an area the "Yard" likely is, and even plaintiffs' historian expert concedes that he cannot know for certain (at least absent a full archaeological survey of that portion of the property) exactly where the Yard was located or exactly how large it is. See Dkt. 143-8 at 7-10.

9

rights are subject to the terms of that deed. By that deed, Reynolds (Thomases' predecessor-in-interest), conveyed the stone, including limestone, on his property to Wilson and also conveyed to Wilson ownership of 127 acres of adjacent land in fee simple.

After the conveyance of the adjacent land in fee simple, the 1849 Deed conveyed the stone on the Reynolds/Thomas Property through the following grant:

> And whereas . . . Reynolds did . . . sell to the said Wilson, under certain qualifications, and subject to certain privileges therein expressed, all the stone and rock upon every portion of his own land . . . , together with certain rights of way over his the said Reynolds' own land: This indenture therefore witnesseth that the said Reynolds and his wife, for the several considerations before mentioned as moving them to this conveyance, have also given, granted, bargained and sold, and do hereby give, grant, bargain, sell and convey, to the said Wilson and his heirs and assigns forever, all the stone or rock of every kind, and particularly all limestone, or quarries of limestone or other kind of stone, in and upon any and every portion of the said Reynolds' own land which was owned by him at the date of said agreement . . . with the privilege to the said Wilson, his heirs or assigns, of free ingress, egress, and regress, at all times, to enter and quarry, and take the same away or to construct kilns and burn the same into lime, on the said Reynolds' own land . . . . And this is to be a perpetual privilege.

Dkt. No. 143-1 at 19 (typed version of 1849 Deed).

Immediately following the foregoing conveyance, the 1849 Deed stated, "But this portion of the contract and conveyance is subject however to the following limitations or qualifications." Id. It then reserved to Reynolds, during the term of his own life, the "personal privilege" to burn a certain amount of lime every year. Id. It also reserved for Reynolds, and for his heirs or assigns, the right to "take and make use of any stone upon his own land . . . that may be suitable and needful for building purposes on his own land." Id. It further required "fair and reasonable compensation" to Reynolds, his heirs or assigns, for any damage to the crops on the land resulting from burning or taking away of the stone. See id.

10

After the foregoing restrictions, the Deed also contained the following language (hereinafter referred to as the "Yard Restriction"), the meaning and significance of which is vigorously contested in the case at bar:

> And it is also agreed and understood between the parties that the said Wilson, his heirs or assigns, is not to blast, or quarry, or take away, any stone within the inclosure of the yard attached to the said Reynolds' present dwelling house; **this provision being inserted to protect the family of the said Reynolds, and of his heirs or assigns, or other persons who may be in the occupancy of the house from annoyance.**

Id. (emphasis added).[9]

In a prior opinion addressing Carmeuse's motion to dismiss, Judge Turk addressed—and rejected—Carmeuse's argument that the emphasized portion of the Yard Restriction rendered occupancy of the dwelling house a condition precedent to enforcement of the Yard Restriction. See Dkt. No. 38 at 8-12. In its summary judgment pleadings, Carmeuse acknowledges Judge Turk's prior ruling, but points out that the ruling was in the context of a motion to dismiss.[10] Carmeuse further relies on a subsequent opinion from the Supreme Court of Virginia that it says requires a different result—CNX Gas Co., 752 S.E.2d 865. Carmeuse also offers a number of other arguments as to why the Yard Restriction is not enforceable, including the doctrine of changed circumstances and the argument that the Yard Restriction is void pursuant to the doctrine of repugnancy.

---

[9] The 1849 Deed also includes another reference near its conclusion that it is conveying "the title to the other grants of stone, subject to the qualifications, reservations and other stipulations herein before set forth." Dkt. No. 143-1 at 20.

[10] Not all the arguments that have been raised on summary judgment were raised and briefed at the motion to dismiss stage.

11

Helms agrees with Carmeuse that the Yard Restriction cannot be enforced and focuses his arguments on the doctrine of repugnancy under Virginia law.[11] Helms argues that the provision created a reservation and that the legal intent of that reservation should be considered in deciding whether or not the Yard Restriction is void for repugnancy.[12] Dkt. No. 192 at 17. According to Helms, the explanatory clause in the 1849 Deed "expresses the legal intention that Reynolds retained a right of occupancy by reservation, and that he did not retain ownership of any portion of the 'stone and rock of every kind' by exception, nor did he retain any permanent right to possess a portion of the 'stone or rock of every kind' under some fanciful kind [of] perpetual restriction." Id. Both Carmeuse and Helms also emphasize and rely heavily on the general proposition that the Yard Restriction must be construed most strongly against the grantor and his successors (here, the Thomases).

Plaintiffs' title expert, Mr. Warner, has opined that the Yard Restriction was "best seen as a reservation by the Grantor of the limestone in this area, but it may also be seen as the complete prohibition of any easement to enjoy the limestone estate in that area." Dkt. No. 194-3 at 2. "The only difference between the former and the latter is that the former would allow the Grantor to convey such limestone to a third party." Id. Thus, even plaintiffs' expert agrees that the precise nature of the rights retained by the Yard Restriction is not clear on the face of the Deed.

The court has carefully considered the arguments of the parties on this point, and has carefully considered the language of the 1849 Deed. As an initial matter, the court concludes that the deed is unclear as to exactly what the Yard Restriction was intended to reserve or restrict, and

---

[11] In his filings, Helms divides the Yard Restriction into two parts that he refers collectively to as the "Yard Clauses." Helms describes the first portion as a "non-blasting clause" and the second as a "right-of-occupancy" clause. Dkt. No. 192 at 20-21.

[12] In his written filings, Helms argued that the Yard Restriction created an exception, not a reservation. At oral argument, counsel explained that he had erred in his brief and that what he had meant to write was that the Yard Restriction created a reservation.

through what type of property right. Having found the language of the Yard Restriction ambiguous, therefore, the court must "consider the surrounding circumstances and probable motives of the parties," and must also apply the rules of deed interpretation as set forth above. See CNX Gas Co., 752 S.E.2d at 867.

In the court's view, neither of the interpretations offered by Mr. Warner—that the Yard Restriction could be construed as a retention in fee simple, with a right of conveyance, or that it could instead be considered a permanent restriction on quarrying within the yard—are consistent with the language of the deed as a whole or with the surrounding circumstances and probable motives of the parties. First, the Yard Restriction does not clearly and unambiguously indicate an intention to retain (or reserve) ownership over the stone within the yard. Instead, the 1849 Deed has an extremely broad granting clause, conveying "all the stone and rock of every kind, and particularly all limestone . . . in and upon any and every portion of the . . . land." Nothing in the deed or the language of the Yard Restriction suggests that Wilson and Reynolds intended to reserve the stone in the yard, or the yard itself, in fee simple with a right of conveyance. If the intent of the parties was for Reynolds to continue to own both the surface and stone on that portion of the land in fee simple, the parties easily could have made such a provision. However, they did not.

The second alternative suggested by Mr. Warner is likewise inconsistent with the 1849 Deed as a whole and, in particular, with the granting clause. If plaintiffs are allowed to prevent quarrying in perpetuity, that is wholly inconsistent with the broad grant of the mineral estate. That is, the broad language of the granting clause reflects that the stone and rock everywhere on the Property (which would include the entirety of the yard) is conveyed to Wilson. But then, as

13

Helms aptly describes, the Yard Restriction "claws back" with an uncertain restriction. See Dkt. No. 192 at 19.

In determining what the Yard Restriction intended to reserve, one of the "surrounding circumstances" the court must consider, see CNX Gas Co., 752 S.E.2d at 867, is that—due to the nature of limestone—it can only be accessed by quarrying, which necessarily disturbs or destroys the surface.[13] This was the general way limestone was quarried both in 1849 and today. See generally Dkt. No. 168-29 at 12-16 (geological expert discussing quarry and mining practices from 1850 to the present). Indeed, the Supreme Court of Virginia has recognized this fact, at least as early as 1928. See Beury v. Shelton, 144 S.E. 629, 633 (Va. 1928) ("The only way [limestone] is removed, or can be removed, is by quarrying, which requires the taking off of any top soil that may lie above it and blast it off. There is nothing left when the limestone is taken."); see also Heinatz v. Allen, 217 S.W.2d 994, 998 (Tex. 1949) (recognizing that "limestone is recoverable only by quarrying or the open pit method which destroys the surface for agricultural and grazing purposes"); Little v. Carter, 408 S.W.2d 207, 209 (Ky. 1966) ("In this country [limestone] is a part of the soil, and a conveyance that reserves the limestone with the right to remove it would reserve practically everything and grant nothing."). Because of this, Wilson's ownership of the stone in the area of the Yard would have been meaningless without the ability to blast, quarry and take it away. Put differently, the converse of the statement in Little is applicable here, i.e., "a conveyance that [grants] the limestone with[out] the right to remove it would . . . grant nothing." Cf. Little, 408 S.W.2d at 209.

---

[13] In this respect, limestone is different from other minerals, such as coal, which at one time was mined only through underground mining methods and then was later also mined through strip mining. Courts have been careful to distinguish between which type of method was contemplated by the parties when dealing with coal. See, e.g., Phipps v. Leftwich, 222 S.E.2d 536 (Va. 1976).

14

Furthermore, an express easement allowing all right of ingress and egress and specifically allowing "quarrying" (rather than mining),was set forth in the Deed. <u>See</u> Dkt. No. 143-1 at 19 (conveying to Wilson, his heirs or assigns, the privilege of "free ingress, egress, and regress, at all times, to enter and quarry, and take the same away"). The use of the language "quarrying" is significant. In <u>Beury</u>, for example, the Court concluded that a reservation in a deed that granted land in fee simple, but reserved the minerals and the right to mine, did not include a reservation of limestone. The Court relied heavily on the fact that limestone is obtained by quarrying and the reservation did not include the right to "quarry," but only the right to "mine." 144 S.E. at 633. The 1849 Deed's references to quarrying demonstrates that the parties contemplated destruction of the surface.

Thus, there is a clear conflict here between the broad granting clause and this uncertain restriction. That is, the granting clause expresses that Wilson would own all the stone, which includes the stone within the enclosure of the yard, but the Yard Restriction suggests that he could not quarry there. In light of the undisputed fact that the only method of obtaining limestone (both in 1849 and today) is quarrying with its resulting destruction of the surface, there is an inherent and explicit tension between the granting clause and any limitation that Reynolds attempted to impose regarding the yard. The court acknowledges that the parties to the 1849 Deed may not have envisioned the type of quarrying operation that is conducted in modern times, but they nonetheless knew that the only way to extract stone was through quarrying. Thus, it would have been meaningless to convey all of the stone, but then prevent quarrying of some portion of it for all eternity. The court thus concludes that the modern rule of repugnancy applies.

That rule of repugnancy provides that

> the intent of the parties, where clearly and unequivocally expressed within the four corners of the instrument, will be given effect. But

> where there is an irreconcilable conflict between the granting
> clause and the other parts of the deed, and it is impossible to
> discover with reasonable certainty the intention of the parties, the
> common law rule continues to apply and the granting clause
> prevails.

Goodson v. Capeheart, 349 S.E.2d 130, 133 (Va. 1986). As applied here, that rule requires that the Yard Restriction be deemed void and that the granting clause prevails.

Moreover, even if the granting clause could have been harmonized with the Yard Restriction in 1849 (either because quarrying operations were much smaller then or because Reynolds and others were still living in the dwelling house and the yard was still clearly marked), the reason given for this restriction on the grantee's rights is no longer valid. That is, while the court agrees with Judge Turk that the express language of the Yard Restriction is not conditioned upon occupancy, the decision in CNX (as well as prior decisions), requires that the court take into account the explanatory clause of the Yard Restriction when interpreting what the parties intended by it. That clause states that the reason for the provision is "to protect the family of the said Reynolds, and of his heirs or assigns, or other persons who may be in the occupancy of the house from annoyance." Dkt. No. 143-1 at 19.

Looking at the entirety of the Yard Restriction, including the explanatory clause, the court is constrained to conclude that the purpose of the restriction was to protect those in the occupancy of the house from annoyance. Based on this, even if the Yard Restriction was not void from the outset, it is no longer a valid, enforceable reservation. The undisputed facts establish that no one occupies or has occupied the house for some time and, indeed, given modern zoning restrictions,[14] no one can occupy the house.[15] That is, the court concludes that the ambiguous

---

[14] With regard to the zoning of the property, plaintiffs argue that they attempted to obtain a zoning change after purchasing the property, but that Carmeuse's predecessor opposed that zoning request. Plaintiffs rely on this fact and the "prevention doctrine" to argue that "Carmeuse cannot avail itself of a nonperformance for which it is responsible." Dkt. No. 168 at 41 (citing Parrish v. Wightman, 34 S.E.2d 229, 232 (Va. 1945)). Even if the zoning

reservation of rights in the yard with the purpose of protecting the occupants of the house—if it were ever valid at all—is no longer a valid reservation.

The court's conclusion in this regard is buttressed by the case of <u>Bradley v. Virginia Ry. & Power Co.</u>, 87 S.E. 721 (Va. 1916). There, the disputed deed conveyed about 600 acres of land, but included the following reservation: "But reserving the family burying ground and also the servants' burying ground, each to contain one-eighth of an acre, with the right of free ingress and egress to and from the same." <u>Id.</u> at 721. At the time of the original conveyance, only one person was buried there, and another was buried there later, but both bodies were subsequently removed by family members and interred at a cemetery. The appellant (who was a successor-in-interest to the grantor in that deed) contended that the language constituted an exception of the one-fourth of an acre from the grant of a fee simple title, while the appellee contended it was a mere reservation.

The Court agreed with the appellee, reasoning:

> the purpose of the grantor was to secure a spot for the use of his family as a graveyard, with free ingress and egress thereto. This was completely accomplished by the language he employed to express his meaning. It would, we think, be a strained, if not unwarranted, construction of the language, under the facts and circumstances, to hold that it was intended thereby to carve out of the midst of this estate a quarter of an acre that would pass to the heirs of the grantor after it had been abandoned as a graveyard and all interments had been removed therefrom.

<u>Id.</u> at 723.

---

were the critical factor here, the prevention doctrine is of no benefit to plaintiffs. It is a principle of contract law, and plaintiffs have not cited to a Virginia case where it has been applied in the context of determining real property rights.

[15] For purposes of its summary judgment ruling, the court presumes the current stone house is the same structure as the "Reynolds present dwelling house." <u>But see supra</u> note 8.

Similarly, although the Yard Restriction stated it would apply to "Reynolds, his heirs and assigns," the purpose and intent of the restriction was to prevent quarrying activities in the yard from annoying those in "Reynolds' present dwelling house" and the immediate vicinity. The changes since the time of the conveyance have left the house unoccupied and unoccupiable, much like the reserved burying area in Bradley was no longer a burial ground. Accordingly, "under the facts and circumstances" here, it would be a strained interpretation of the language to allow it to carve out of the midst of the limestone estate an untouchable "Yard" that could pass to the heirs or assigns of the grantors after it had been abandoned as a Yard and dwelling house. Cf. Bradley; cf. also Robertson v. Bertha Min. Co., 104 S.E. 832, 833-34 (Va. 1920) (in context of grant of an easement, where the later "use of that easement amounts to a material change in its character as originally granted," such use is unlawful because the use of a right of way "must be confined to the terms and purposes of the grant"; thus, where a right of way had been granted for a railroad for use in connection with a mining company's transport of its mined materials, but the mining operations had wholly ceased and not resumed, it could not be used by a successor for the purpose of hauling lumber, logs, and cross-ties related to a separate company's lumber interest).

Both the rule of repugnancy, and the rule that an ambiguous limitation or reservation in a deed is to be construed in favor of the grantee, support the same conclusion here. CNX Gas Co., 752 S.E.2d at 867. These legal principles compel the ruling that the Yard Restriction is not enforceable by the surface estate owners against the owners of the limestone estate.

**Division of the Limestone Estate as Between Helms and Carmeuse**

The second and third disputes raised by the summary judgment motions concern the determination of what portion of the limestone estate on the Property is owned by Helms and what portion is owned by Carmeuse. There are two major areas of disagreement as to this overall

18

issue. The first concerns the proper interpretation of two related deeds recorded in 1901 and 1902. The second concerns the proper interpretation of two 1992 deeds.

### A. The Portion of the Limestone Estate Conveyed By the 1901 and 1902 Deeds

The 1901 and 1902 deeds were the result of chancery proceedings and a public sale. Specifically, some years after Wilson's death, the Circuit Court of Botetourt County entered an order of sale on October 28, 1898, in which it charged special commissioners with the duty "to make sale of all of the real estate known as the Limestone Properties IV above owned by the late John S. Wilson at the date of his death . . ." Dkt. No. 192 at 3 (citing Chancery Order Book 9, page 414-415). The "Limestone Properties" thus were segregated from a number of other properties that Wilson owned, and they were handled separately in the partition suit.

In a May 10, 1901 document in the chancery suit titled "Additional Special Terms of Sale," the commissioners referenced two different parcels at issue here. The first, identified as Parcel No. 1, included a tract of land to the south of the current Thomas Property, and also included the "stone rights on the D.L. Pitzer tract [i.e., the Reynolds/Thomas Property] for a distance of three hundred feet from the division line between E. Dillon's heirs and the Pitzer tract, along the vein of grey Limestone in a north-easterly direction instead of eight hundred feet,[16] as the line was at the former offering . . ." Dkt. No. 143-1 at 24; <u>see also</u> Appendix No. 5 (docketed as Dkt. No. 143-1 at 29) (map reflecting Parcel Nos. 1 and 2, as envisioned by Carmeuse).

The second, identified as Parcel No. 2, included a tract of land largely north and east of the current Thomas Property and "all the stone and mineral rights on the Pitzer land North-East of the line of division between this tract and no. 1, set out above under description of tract no. 1.

---

[16] The division line was initially located 800 feet north-east of the southern property line of the Property (then known as the "Pitzer Tract.")

Together with contract rights with the C.& O. Ry. Co. for sidetrack at Rocky Point; and any rights of way owned by John S. Wilson's estate for tramway through the Webster land." Dkt. No. 143-1 at 24; see also Appendix 5.

The final sale of these two parcels occurred on the courthouse steps at 2:00 p.m. on May 27, 1901. Although offered first as Parcel No. 1 and Parcel No. 2, they were then offered as a whole, and Louise W. Turpin's winning bid for the property as a whole was $15,510.00.[17] The bid was confirmed by the court's order of May 27, 1901. Dkt. No. 143-1, at 33. After payment in full, legal title was conveyed, and Turpin directed conveyances be made to a number of Wilson's relatives, in various undivided interests proportional to their contributions toward the purchase price. Upon payment, the deeds of conveyance were recorded separately in 1901 (as related to "Parcel No. 2") and 1902 (as related to "Parcel No. 1").

Specifically, the 1901 Deed (related to Parcel No. 2) conveyed the surface and minerals on property northwest of the Thomas Property (on a parcel known and occasionally referred to as "Rocky Point Farm"). It further conveyed a portion of the mineral estate of the Thomas Property, described as: "Also the right to all the limestone on the land of the late G.B.W. Reynolds, now in the name of Lavinia Pitzer, adjoining the above lands, and along the vein of grey limestone, on said Reynolds lands extending in a South-Westerly direction, to a line three hundred feet from the line of the E. Dillon land, together with all the rights of ingress, egress, and regress, and all the privileges and rights of quarrying and using, and burning, and removing the stone on . . . the Reynolds land, accorded [Wilson] in the [1849 Deed.] . . . All of which properties and rights, are described in the papers of said causes, as 'Parcel no. 2.'" Dkt. No. 143-1 at 36-37.

_____

[17] Apparently, Turpin was one of Wilson's daughters and was bidding on behalf of a group of Wilson's heirs.

By the 1902 Deed, title to Parcel No. 1 was conveyed by Special Commissioner Glasgow to the persons as directed by Turpin. The 1902 Deed included the conveyance of land south of the Thomas Property, but also the following:

> The property hereby conveyed includes all that property sold to said Louise W. Turpin in said proceedings and described therein, as "Parcel No. 1," of the Limestone properties of John S. Wilson decd.,…**This deed also conveys all the stone on the land of Lavinia Pitzer, from line of "parcel no. 2," (which parcel has heretofore been conveyed by said commissioner to the parties of the second part, by deed of date the 23d day of December 1901) thence South West to E. Dillon's line;** together with all rights of ingress, egress and regress to said lands, and all other rights and appurtenances, as to quarrying, and burning said stone, and all other rights as to said stone, and said land, now owned by the heirs of Lavinia Pitzer which rights &c. were conveyed to said John S. Wilson by [the 1849 Deed].

Dkt. No. 143-1 at 39-40 (emphasis added).

Carmeuse and Helms contend that these two deeds conveyed the <u>entirety</u> of the stone rights originally conveyed in the 1849 Deed. Plaintiffs disagree, arguing that the 1901 and 1902 Deeds only conveyed a <u>portion</u> of the original stone rights. Plaintiffs thus claim that the easements are limited accordingly and that neither Carmeuse nor Helms, nor the two of them together, own the entirety of the severed limestone estate.

In support of their contention, plaintiffs advance two arguments based on the language of the Deeds. First, they argue that the use of the terms "vein of grey limestone" and "limestone" in the 1901 Deed, instead of the broader "stone" used in the 1849 Deed means that only limestone and not all stone was conveyed.[18] See Dkt. No. 168 at 18. Second, they point to the fact that

---

[18] The court presumes, for purposes of summary judgment, that the Thomases are correct that "stone" was a broader term than "limestone" in 1901, but notes that Carmeuse contends that historically the term "limestone" has been used broadly to refer to all of the types of stone that exist on the Property, including what is today referred to as high-calcium (or medium-grade) limestone and also what is referred to as dolomitic limestone or dolomite, both of which are carbonates. See Dkt. No. 143 at 25-26 (discussing and citing this court's decision in James River Hydrate & Supply Co. v. United States, 221 F. Supp. 824, 825 (W.D. Va. 1963) (the "term 'limestone' is usually used to include dolomites") and the decision affirming it, James River Hydrate & Supply Co. v. United States, 337 F.2d

Dillon owned only a portion of the neighboring property on the southern boundary of the Property, see Appendix 5, and thus the reference to the Dillon property line in both deeds also serves to limit the limestone conveyed. Dkt. No. 168 at 19-20.[19] Because these two deeds conveyed less than the entire mineral estate that was conveyed by the 1849 Deed, the plaintiffs' argument continues, the remaining portion of that mineral estate reverted back to Reynolds' successors, i.e., the Thomases, by operation of law.

As to plaintiffs' first argument, i.e., that the 1901 Deed conveyed only "limestone" and not "all the stone," plaintiffs are correct that in one portion of the granting clause, the 1901 Deed referred only to "limestone" and did not use the term "stone." But the court cannot conclude, as plaintiffs urge, that the 1901 Deed thus unambiguously conveyed only limestone and not all stone that was conveyed in the 1849 Deed. Instead, two other aspects of the 1901 Deed suggest that all the stone rights were intended to be conveyed or, at the very least, they render the deed ambiguous.

First, the 1901 Deed conveyed "all the rights of ingress, egress, and regress, and all the privileges and rights of quarrying and using, and burning, and removing the stone on . . . the Reynolds land, accorded [Wilson] in the [1849 Deed.]." It would not have made sense for the grantors to have conveyed all the rights of ingress, egress, and regress and all the privileges and rights of quarrying and removing "the stone" conveyed by the 1849 Deed, but then limited the conveyance in the 1901 Deed to only limestone.

---

277, 278 (4th Cir. 1964) ("dolomite is only a subclass of limestone [and] the evidence indicates that neither historically, geologically nor industrially may dolomite be divorced from the general class of rock known as limestone"). The court notes, however, that the expert report of Carmeuse's geologist actually states that "[d]olomite was discovered **and differentiated from limestone** in the 18th century." Dkt. No. 143-3 at 12 (emphasis added).

[19] Based on these two assertions, plaintiffs further contend that the quarrying rights were limited by operation of law. Dkt. No. 168 at 22. Because the court rejects plaintiffs' proffered interpretation of the 1901 and 1902 Deeds, this third argument is moot.

Second, the 1901 Deed expressly described the properties being conveyed as "parcel no. 2" in "the papers of" the partition suit. Those "papers" include, for example, the terms of sale set forth by the commissioners, which expressly referenced Parcel No. 2 as including the "stone rights," on the Property, not simply "limestone." See Dkt. No. 143-1 at 24.

Thus, the court concludes that the language is ambiguous at best and that it may consider the surrounding circumstances. The surrounding circumstances—and particularly the circumstances regarding the sale of these properties—make clear that the 1901 and 1902 deeds were intended to convey the entirety of the stone estate conveyed in 1849.

For example, in addition to the internal references to "stone" in the 1901 Deed and in the suit papers referred to in that deed, the 1902 Deed likewise conveyed the remaining "stone" and is not just limited to limestone. There is no reason suggested in any of the documents why the properties (which were actually sold as one property) would include only limestone and exclude all other stone on one portion, and include all stone in the second portion. Instead, the two deeds were meant to convey an entire whole (the "limestone properties") and were divided solely for the benefit of Ms. Turpin to be able to make two separate payments. So, no reason appears for conveying only the limestone in one parcel and the broader "stone" in the second parcel. Additionally, the rule that ambiguous language is construed against the grantor and in favor of the grantee, and that the grantor's language must be interpreted to convey all that he is capable of passing, favor the court's conclusion. CNX Gas Co., 752 S.E.2d at 867.

Moreover, plaintiffs' argument would require the court to accept that the persons tasked with dividing the entirety of Wilson's property upon his death—including the special commissioners and the chancery court charged with overseeing and approving that process— actually conveyed less than all of that estate, in abrogation of their duties. See Dkt. No. 192 at

10-11 (Helms asserting this argument). There is nothing about the language in the 1901 or 1902 Deeds that compels such a result and again, to the extent the 1901 Deed's use of both "stone" and "limestone" renders the deed ambiguous, the surrounding circumstances suggest that the intention of both the grantor (the special commissioner) and the grantees (Wilson's heirs) was to convey the entirety of his properties.

The court is thus firmly convinced that the proper legal interpretation of the two deeds is that the interest being conveyed was the entirety of the stone, and the use of the term "limestone" in the 1901 Deed was not intended to limit the conveyance. As Helms and Carmeuse argue, the term limestone was more likely used simply because that was how the properties were known, in that it was the limestone that made the property valuable, as evidenced by the other documents in the chancery file, all of which indicate that the limestone gave the property its value.

The court is also unpersuaded by plaintiffs' argument that the limestone conveyed was limited in some fashion by the reference to the Dillon line or by the language "along the vein of grey limestone" extending in a southwesterly direction. The 1901 Deed itself referenced "all the limestone," and the use of the word "and" before "along the vein of grey limestone" did not reflect any intent to limit the amount of limestone. Instead, the language "and along the vein of grey limestone, on said Reynolds lands extending . . .," as well as the reference to the Dillon line, when read in context, both provide a description of the dividing line between the two parcels. Perhaps it would have been more clear if the deed had referred to both the Dillon line and the owner of the property to the northwest of Dillon (which makes up the remainder of the boundary) with the Thomas Property. See Appendix 5 (parcel listed as 42(2)(3) could have been referenced, as well). Nonetheless, nothing about the reference to the Dillon line alone suggests that the stone being conveyed was limited as plaintiffs urge; instead, all indications were that the

24

stone and quarrying rights conveyed to Wilson by Reynolds were being conveyed by these two parcels. Additionally, as Helms notes, if the division line (running parallel to the boundary with the Dillon line) stopped at a place perpendicular to where the Dillon property stopped, it would divide nothing. Instead, the line can only run through the entirety of the Pitzer land to actually divide it.

For all of the foregoing reasons, the court concludes that the 1901 and 1902 Deeds conveyed all of the mineral estate originally conveyed in the 1849 Deed.

### B. The Property Conveyed in the 1992 Deeds.

Having determined that the entirety of the limestone estate originally conveyed in 1849 was also conveyed by the 1901 and 1902 Deeds, the court turns to the dispute between Helms and Carmeuse as to the division of the mineral estate between them. This issue turns primarily upon the court's interpretation of two 1992 deeds. Prior to focusing on the language of the two 1992 deeds, however, the court highlights a few important earlier conveyances.

First, it is undisputed that in 1924, Wilson's heirs conveyed all of their interests from the 1901 and 1902 deeds to Wilson Lime Company, Inc. ("Wilson Lime") and that the mineral estate was merged back into a singular property interest at that time. That is, Wilson Lime owned full title to the mineral estate in 1924.

Additionally, both prior to 1924 and subsequently, the owners of the mineral estate leased certain mining rights on the property. According to Carmeuse, one of the leases, a 1917 Lease, is the origin of language also included in the 1992 deed and must inform any interpretation of the 1992 deed. In the 1917 Lease, the Wilsons leased to an individual named John Stull:

> the stone rights, with all the rights and privileges necessary to
> quarry and remove the stone, on half the veins of limestone on a
> 200 acres tract of land belonging to G.W. Webster and adjoining
> the 306 acre tract; said half to be measured along the veins of

25

limestone from the division line of said 306 acre tract; in a
southwesterly direction . . . The said 306 acre tract and the stone
rights on the 200 acres adjoining, mentioned in this lease above, is
the tract No. 1, conveyed to the parties of the first part and others
by deed from F.T. Glasgow, Commissioner, of date the _____ day
of _____, 1_____, and recorded in the Clerk's
Office of Botetourt county in D. B. _____,
page_____.

Dkt. No. 143-1 at 41.

Carmeuse's proffered title expert notes that the "above language contains several blanks

and one clear error (the reference to tract (Parcel) No. 1, instead of Parcel No. 2)," but insists that

later leases "confirm that the reference is to Parcel No. 2, conveyed by the 1901 Deed." Dkt. No.

143-1 at 9-10. He further opines that the "'half the veins of limestone' language in the 1917

Lease clearly contradicts the reference to the original Court Ordered division deed wherein

Parcel No. 2 was conveyed way more than half by surface geometry" and his unsupported

conclusion that "[t]his appears to be more the casual assumption that it was half and half

originally, than a conscious attempt to make a new division line." Id. at 10.[20]

There are two 1992 deeds at issue. In the first—the 1992 James River Deed—Wilson

Lime conveyed to James River Limestone Company (O-N Minerals' predecessor-in-interest)

both ownership of lands north of the Thomas Property (essentially the Rocky Point Farm) and

also certain mineral rights. The second—the 1992 Helms Deed—conveyed to Helms a certain

parcel of land in fee simple and stated its purpose is to convey all property "in the area" owned

by Wilson Lime that was not conveyed in the 1992 James River Deed. Thus, what was conveyed

to Helms turns directly on what was conveyed in the 1992 James River Deed.

---

[20] Both Helms and plaintiffs challenge the validity of these opinions. Because the court concludes the 1992
Deeds are unambiguous, it does not look to the 1917 Lease or other extrinsic evidence and need not address the
validity of these opinions. It sets them forth here simply to aid the reader in understanding Carmeuse's contentions.

The 1992 James River Deed contained certain language referencing "half the veins" and the parties disagree about the meaning of this language. Specifically, that Deed granted certain property in fee simple. It then granted mineral rights "on half the veins of limestone on a 200 acre tract of land belonging to G.W. Webster [basically the Thomas property], and adjoining the said 306 acre tract [a reference to the Rocky Point land conveyed in the same deed in fee simple]; said half to be measured along the veins of limestone from the division line of said 306 acre tract in a southwesterly direction . . ." Then, in the separate 1992 Helms Deed, Helms was conveyed a specific parcel of land in fee simple (identified as 329 acres bounded by various other properties). The 1992 Helms Deed contains a derivative clause describing the property in fee simple and finally the statement that "the purpose of this Deed [is] to convey all the property in this area owned by Wilson Lime Company, Inc., not previously conveyed by [the 1992 James River Deed]."

Based on these two deeds, Helms' argument on this point is simple and straightforward: the 1992 Deed says "half the veins of limestone." He argues that half was conveyed to Carmeuse's predecessor and he received what was left—the other half—in the 1992 Helms Deed.

In response, Carmeuse claims that this interpretation of the "half-the-veins" paragraph "lacks any basis." Instead, Carmeuse contends that the language "half the veins" refers not numerically to "half," but to that portion that was conveyed as part of Parcel No. 2 back in the 1901 Deed, i.e., the 300-foot-wide strip along the southern border of the property.[21]

_____

[21] Plaintiffs weigh in on this issue, but only in a convoluted way. First, plaintiffs' title expert offers his opinion that the 1992 Helms deed "purports to convey the property previously conveyed by the 1902 Deed," but that the deed is "far from clear." Dkt. No. 194-3 at 14. He further states that he cannot render an opinion regarding ownership of the remaining limestone estate on the Thomas property and that "an experienced real estate attorney would not issue a title opinion certifying ownership based upon the documents in the chain(s) of title." Id. at 14-15. Nonetheless, plaintiffs state that, to the extent that the court determines that Helms and Carmeuse together own all

To analyze their respective rights, the court first must determine whether there is any ambiguity in the 1992 James River Deed. Notably, the mere fact that that the parties disagree about the meaning or proper interpretation of the deed does not create an ambiguity. See Amos v. Coffey, 320 S.E.2d 335, 337 (Va. 1994). Rather, the court must review the plain language of the deed to ascertain whether there is ambiguity. Only if "the language admits of being understood in more than one way or refers to two or more things at the same time" does it allow the court look to circumstances or documents outside the deed. Id.

Having carefully reviewed the 1992 James River Deed, the court finds no ambiguity in its terms. The deed conveyed "half the veins of limestone" on the Webster property and did not limit that conveyance in any way, nor did it describe the mineral estate being conveyed by reference to the 1901 Deed. Carmeuse argues, however, that the deed refers to the 1901 Deed expressly in its derivative clause and thus was meant to incorporate the boundaries set forth in the 1901 Deed, despite its use of the word "half."

Contrary to Carmeuse's argument, the derivative clause in the 1901 Deed has no bearing here because it relates only to the property being conveyed in fee simple in the 1992 James River Deed. As Helms correctly points out, the 1992 James River Deed conveyed two distinct property interests. First, it conveyed a tract of land north of the Thomas Property in fee simple, and then it conveyed the mineral rights and all rights and privileges necessary to quarry and remove stone on a portion of the Thomas Property. While the derivative clause for the first conveyance references the 1901 Deed, the conveyance of mineral rights on the Thomas Property does not. Instead, the portion of the deed conveying the minerals has no derivative clause and it does not otherwise reference the 1901 Deed. Thus, there is nothing to tie the conveyance of the mineral

the limestone estate (as the court has now ruled in interpreting the 1901 and 1902 Deeds), then plaintiffs agree with Helms that Helms owns half of the limestone and not the much smaller portion suggested by Carmeuse.

rights to the derivative clause. Put differently, the portion of the 1992 James River Deed conveying ownership of the stone on the Thomas Property cannot be explained or limited by the derivative clause of an unrelated, earlier conveyance in the same deed.

Helms also correctly notes that even if the derivative clause were applicable to the grant of mineral rights on the Thomas Property, it does not compel the conclusion that only the portion of the mineral estate transferred by the 1901 Deed was conveyed. In addition to referencing the 1901 Deed, the derivative clause also referred to a 1924 Deed that conveyed all of the properties owned by Wilson's heirs, including the entire undivided mineral estate. This undercuts any claim that the reference to the 1901 Deed (or to Parcel No. 2) in the derivative clause (or in the derivative clauses of the quarry leases) should inform the division of the mineral estate. In short, had the parties intended to convey in the 1992 James River Deed that portion of the mineral rights conveyed in the 1901 Deed, they could easily have provided to this effect. They did not. Moreover, as already noted, the mineral estate was unified in single ownership as of 1924, and Carmeuse does not point to any subsequent transfer of ownership that maintained the division line from the 1901 and 1902 Deeds.

The court further declines Carmeuse's invitation to look to the language of the prior leases or to other documents to explain or contradict the plain terms of the 1992 James River Deed. The court has also considered the remaining arguments by Carmeuse as to the proper interpretation of the 1992 James River Deed, but they do not alter the court's conclusions.

The court next concludes that the plain terms of the 1992 Helms Deed resulted in the transfer of Wilson Lime's remaining mineral estate in the Thomas property, by virtue of the portion of the Deed that states its purpose is to "convey all of the property in this area owned by Wilson Lime Company, Inc., not previously conveyed by" the 1992 James River Deed. See

29

<u>Amos</u>, 320 S.E.2d at 338. In <u>Amos</u>, the disputed deed stated it was conveying "all of those

certain tracts or parcels of land . . . in or near the Town of Gretna," which statement was

followed by a metes-and-bounds description of a number of parcels. <u>Id.</u> at 336. Then, the deed

provided: "It is the intention of the parties of the first part to convey to the party of the second

part all the real estate which they now own in Pittsylvania County, Virginia, including but not

restricted to the lands described above." <u>Id.</u> The court concluded that the deed was unambiguous

and that its language was sufficient to convey a separate parcel that was not included in the

property described in metes and bounds. <u>Id.</u> at 338. Likewise, the broad language that the 1992

Helms Deed is conveying "all of the property in this area owned by Wilson Lime Company, Inc.,

not previously conveyed by the James River Deed" is sufficiently broad to convey the remaining

"half the veins of limestone" owned by Wilson Lime. Thus, the court concludes, consistent with

the plain terms of the 1992 Deeds, that Carmeuse owns "half the veins of limestone" and Helms

owns the other half. [22] It further concludes that Carmeuse's half is to be "measured along the

veins of limestone from the division line of [the 306-acre tract referenced in the 1992 James

River Deed] in a southwesterly direction."[23]

**Methods of Quarrying Permitted**

The final area of dispute among the parties concerns the methods of quarrying that can be

used on the Property, with plaintiffs seeking a declaration limiting the owners of the stone estate

to those quarrying methods that were available at the time of the 1849 Deed.

Carmeuse and Helms (who "adopts and joins in Carmeuse's response," Dkt. No. 192 at

3) contend that "Virginia Courts have recognized that technology improves over time and have

---

[22] Carmeuse and plaintiffs both point to Mr. Helms' deposition testimony concerning his purchase of the property as limiting what was conveyed. Such testimony, however, contradicts the intention of the parties as expressed in the deed and is thus of no consequence. See <u>Amos</u>, 320 S.E.2d at 338.

[23] At the time either owner intends to begin quarrying, it likely will be necessary for a geological survey to be performed to determine the precise location of the actual dividing line between the two halves.

encouraged the use of modern mining techniques." Dkt. No. 143 at 44. They rely, in part, on Oakwood Smokeless Coal Corp. v. Meadows, 34 S.E.2d 392 (Va. 1945):

> The incidental rights of the miner which are appurtenant to the grant of the mineral, are to be gauged by the necessities of the particular case, and therefore vary with changed conditions and circumstances. He may occupy so much of the surface, adopt such machinery and modes of mining and establish such auxiliary appliances as are ordinarily used in such business, as may be reasonably necessary for the profitable and beneficial enjoyment of his property. **But he is not limited, as we have already said, to such appliances as were in existence when the grant was made, but may keep pace with the progress of society and modern inventions.**

Id. at 395 (quoting Williams v. Gibson, 84 Ala. 228, 233–234 (1888)) (emphasis added); accord Yukon Pocahontas Coal Co. v. Ratliff, 24 S.E.2d 559, 563–64 (Va. 1943).

In response, plaintiffs rely heavily on the case of Phipps v. Leftwich, 222 S.E.2d 536 (Va. 1976), but Carmeuse rightly points out that Phipps is distinguishable. Phipps involved a grant of coal in a 1902 deed and addressed whether a successive owner of the coal estate could utilize an advanced strip mining technique that did not exist at the time of the original conveyance of mining rights in 1902. The Phipps Court held that strip mining was not permitted because "underground mining was the only kind of coal mining within the contemplation of the parties to the 1902 deed." It went on to state, however:

> Appellants may, of course, take advantage of developments in the operation of underground mines which modern technology may make available. Improvements in mining machinery, power, lighting, ventilation, transportation, and safety facilities may be utilized. A change, however, from underground mining, which leaves the surface substantially usable by the owner of the freehold, to surface mining, which destroys what was reserved by the grantor, is not permissible.

222 S.E.2d at 713. Thus, even the Phipps Court recognized that technological advances are permitted. Moreover, unlike in Phipps, where surface mining was not contemplated at the time of

31

the grant, quarrying (with its resulting destruction of the surface) was the only way to mine limestone in 1849 and remains so today, as previously discussed. See supra at 13.

Plaintiffs contend that the parties did not anticipate the complete destruction of the entire surface of the property when Reynolds granted Wilson the limestone in 1849, which may be true. Indeed, the 1849 Deed reflects plans by Reynolds to continue using portions of the tract for farming, lime production, and livestock, and reserved the right for his successors to use limestone from the property to build structures on the property forever. All of these restrictions tend to indicate that the parties to that Deed did not envision the complete destruction of the entire tract's surface. But the conveyance of the limestone, both expressly by the Deed, and necessarily by implication, included the right to quarry the limestone, which could only be accomplished through destruction of the surface. So, while the parties may not have anticipated the large, cavernous pits that modern limestone quarrying creates, the destruction of the surface was contemplated. Phipps is therefore distinguishable.

In short, plaintiffs have offered no valid basis for the court to prohibit the use of modern quarrying techniques and neither the 1849 Deed nor the law supports such a limitation here. Accordingly, plaintiffs are not entitled to the declaration they seek.

An appropriate order reflecting the court's rulings herein will be entered.

## CONCLUSION

The clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER this 16th day of January, 2015.

_____
Chief United States District Judge

32