CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 3 1 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JUSTIN D. THOMAS and<br>IRENE S. THOMAS,<br>    Plaintiffs/Counterdefendants,<br><br>v.<br><br>CARMEUSE LIME & STONE, INC.,<br>and O-N MINERALS (CHEMSTONE)<br>COMPANY,<br>    Defendants/Crossclaim Defendants,<br><br>v.<br><br>BARBARA SILVIA HELMS,<br>    Intervenor Defendant/<br>    Counterclaimant/Crossclaimant. | Case No.: 7:12-cv-00413-GEC<br><br>**MEMORANDUM OPINION**<br><br><br>Hon. Glen E. Conrad<br>Chief United States District Judge |

This case concerns a dispute between plaintiffs Justin D. Thomas and Irene S. Thomas (together, the "Thomases") and defendants Carmeuse Lime & Stone, Inc. and O-N Minerals (collectively, "Carmeuse") regarding the parties' respective rights to the property at issue (the "Property"). The matter is presently before the court on defendants' second motion for summary judgment. For the reasons set forth below, the motion will be denied.

### Relevant Factual Background

The court has expounded on the facts of the instant matter at length in its previous memorandum opinion. See Thomas v. Carmeuse Lime & Stone, Inc., 86 F. Supp. 3d 490, 492-95 (W.D. Va. 2015). The Property is part of a 200-acre parcel that was owned by G.B.W. Reynolds ("Reynolds") in the mid-eighteenth century. Reynolds conveyed ownership of the limestone and other minerals on his property to John S. Wilson ("Wilson") in 1849 (the "1849 Deed"). This conveyance created two estates: a mineral estate owned by Wilson and a surface estate owned by

Reynolds. The 1849 Deed grants a number of rights related to quarrying and reserves certain protections. Specifically, the deed conveys

> [A]ll the stone or rock of every kind, and particularly all the limestone, or quarries of limestone or other kinds of stone, in and upon any and every portion of said Reynolds' own land which was owned by him at the date of said agreement.

Docket No. 1-1. The deed also grants to the owner of the mineral estate certain rights of access over the surface estate (the "Access Provision"). The Access Provision provides

> [T]he privilege to said [grantee], his heirs or assigns, of free ingress, egress, and regress, at all times, to enter and quarry, and take the same away or to construct kilns and burn the same into lime, on the said Reynolds' own land, as owned by him at the date of said agreement.

Id. Almost immediately thereafter, the deed states, "But this portion of the contract and conveyance is subject to the following limitations or qualifications." Id. The 1849 Deed then lists several "limitations." Most notably for the instant matter, the 1849 Deed contains the following restriction (the "Yard Restriction"):

> Reynolds did by [] agreement, sell . . . under certain qualifications, and subject to certain privileges therein expressed, all the stone and rock upon every portion of his own land . . . together with certain rights of way over his the said Reynolds' own land . . . . [I]t is also agreed and understood between the parties, that the said Wilson, his heirs or assigns, is not to blast, or quarry, or take away, any stone within the inclosure of the yard attached to the said Reynolds' present dwelling house; this provision being inserted to protect the family of the said Reynolds and of his heirs or assigns, or other persons who may be in the occupancy of the house[,] from annoyance.

Id.

On the northwestern portion of the Property is an old stone house, which, according to one of plaintiffs' experts, "is an excellent, and rare, example of 18th century colonial American architecture." Report of Daniel B. Thorp, Docket. No. 168-3 at 2. Although plaintiffs purchased the surface estate in 2002, they have never lived in the house, no one currently resides in the

2

house, and it has apparently not been occupied since 1999. There is no plumbing or sewage, only an outhouse. Although the house was wired for electricity when the Thomases purchased it, the house does not currently have electricity. Additionally, under current zoning regulations, the house cannot be occupied. Dep. of Justin Thomas at 5, 29-30, 41, 46, 146.

The Thomases' chain of title includes a deed from 1854 in which Reynolds granted his surface estate to his wife. This deed describes the land granted as "two hundred acres of the tract of land, on which [Reynolds] now reside[s], with the mansion house." Supplemental Report of Daniel B. Thorp, Docket No. 168-4 at 1. An 1876 court-ordered surveyor's plat describes the land as that part "laid off . . . to the widow [of Reynolds]." Docket No. 168-8. The surveyor's plat also states that the land conveyed "includes the stone house." Id.

In 1864, the Confederate Engineering Bureau commissioned a map of Botetourt County (the "Confederate Map"). The map denotes with a square marking several structures on the Property. See Docket No. 168-12. There is one square that is labeled "cabin" and is at the location of the present-day stone house. A second square is on the eastern side of Rocky Point Road. Id. On the map's legend, the squares used to mark these structures are defined as "dwellings." Id.

## Procedural History

The Thomases filed the instant action seeking injunctive and declaratory relief in an effort to prevent Carmeuse from core drilling and extracting limestone from the Property, which is adjacent to a quarry owned by Carmeuse.[1] On January 31, 2014, Thomas M. Helms, Sr. was granted leave to intervene, and he subsequently asserted both a counterclaim against plaintiffs

---

[1] The Thomases subsequently amended their complaint, and the amended complaint seeks only declaratory relief.

3

and a crossclaim against Carmeuse.[2] All parties moved for summary judgment or partial summary judgment.

At that time, there were four main disputes. First, the parties disputed the meaning and consequences of the Yard Restriction. Second, the parties disputed who owns the mineral estate. Carmeuse and Helms believed that certain twentieth-century conveyances granted them ownership of the entire underlying mineral estate. The Thomases asserted that the twentieth century deeds reverted a portion of the mineral estate back to the original owner, Reynolds, and therefore, by the chain of title, to the Thomases. Third, Carmeuse and Helms disputed how much of the underlying mineral estate each owns. Fourth, the plaintiffs sought a ruling that the owners of the mineral estate could not use modern mining or quarrying techniques.

The court granted, denied, or granted in part and denied in part the parties' motions. Specifically, the court held (1) that the Yard Restriction is invalid under the doctrine of repugnancy;[3] (2) that Carmeuse and Helms own all of the stone and quarrying rights in the Property; (3) that Carmeuse and Helms each own one-half of the mineral estate; and (4) that the mineral estate owners are not precluded from using modern mining or quarrying techniques.

Thereafter, the parties appealed. The Thomases sought to overturn the court's rulings on the invalidity of the Yard Restriction, that Carmeuse and Helms own the entirety of the mineral estate, and that Carmeuse and Helms may use modern quarrying techniques. Carmeuse sought to overturn the court's determination that Helms and Carmeuse each own half of the mineral estate.

---

[2] On February 15, 2017, after notice of death as to Thomas M. Helms, Sr., the court granted counsel's motion to substitute party, replacing Helms with his intestate successor, Barbara Silvia Helms, as intervenor.

[3] Under the doctrine of repugnancy, "where there is an irreconcilable conflict between the granting clause and the other parts of the deed, and it is impossible to discover with reasonable certainty the intention of the parties, . . . the granting clause prevails." Goodson v. Capehart, 349 S.E.2d 130, 133 (Va. 1986). The court determined that there was an irreconcilable conflict between the granting of the mineral estate, specifically the grant of all of the limestone, which requires disturbance of the surface estate to access through quarrying, and the Yard Restriction, which restricted quarrying in the Yard, rendering the limestone under the Yard inaccessible. Even if the two provisions could be harmonized, the court determined that the stone house was no longer occupied, and the purpose of the Yard Restriction no longer valid.

4

The United States Court of Appeals for the Fourth Circuit affirmed as to each issue except for the court's determination that the Yard Restriction is invalid. The Fourth Circuit, rejecting this court's repugnancy analysis, reasoned, "[I]t is a commonplace in property law for a person to hold formal title to property yet be unable to use some portion of it in his or her preferred manner . . . ." Thomas v. Carmeuse Lime & Stone, Inc., 642 F. App'x 253, 260-61 (4th Cir. 2016). The Fourth Circuit further determined that the Yard Restriction is not void because of the lack of occupancy or other temporary conditions, such as the Property's current zoning. Id. Accordingly, the Fourth Circuit vacated this court's decision as to that issue and acknowledged that the "1849 deed granted Wilson the full mineral estate underlying the [Property], but the Yard Restriction prohibited the destruction of the portion of that tract on which Reynolds's dwelling house sat." Id. In a footnote, the Court further noted that whether the stone house presently on the Property is the "Reynolds dwelling" referenced in the 1849 Deed is a factual issue still in dispute.

Based on the Fourth Circuit's affirmation on the issue of ownership of the mineral estate, the court entered judgment on the division between Helms and Carmeuse on February 15, 2017. On February 3, 2017, the court held a hearing on Carmeuse's second motion for summary judgment as to the enforceability and the scope of the Yard Restriction. The matter has been fully briefed and is ripe for review.

## Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (finding summary judgment appropriate "after adequate time for discovery and upon motion, against a party who

5

fails to make a showing sufficient to establish the existence of an element essential to that party's case"). In deciding whether to grant a summary judgment motion, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Libertarian Party of Va. v. Judd, 718 F.3d 308, 312 (4th Cir. 2013).

"It is the duty of the court to construe a contract as it is made by the parties and not to make one for them." W.D. Nelson & Co. v. Taylor Heights Dev. Corp., 150 S.E.2d 142, 145 (Va. 1966). "The guiding principle in the construction of a contract [or deed] is the intention of the contracting parties as expressed in the words they have used." Id. In the context of summary judgment motions, the grant of summary judgment is appropriate when the contract or deed in question is unambiguous as to the intention or when an ambiguity can be definitely resolved by reference to extrinsic evidence and settled rules of construction. Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc., 476 F.3d 231, 235 (citing Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993)). When resorting to extrinsic evidence is not dispositive of the instrument's proper interpretation, the question is properly submitted to the trier of fact. Goodman, 7 F.3d at 1126.

### Discussion

Carmeuse now moves for summary judgment, arguing that the Yard Restriction is invalid and unenforceable for three reasons: (1) because the doctrine of changed circumstances renders the Yard Restriction invalid; (2) because the deed's vague description of the Yard, and other surrounding circumstances, leave the Yard Restriction too ambiguous to be enforceable; and (3) because the Yard is not located on the Property.

6

## I. Doctrine of Changed Circumstances

First, Carmeuse argues that the doctrine of changed circumstances has rendered the Yard Restriction void. Under the doctrine of changed circumstances, a "change in circumstances that is 'so radical as practically to destroy the essential objects and purposes of the covenant' will render a restrictive covenant null and void." Double Diamond Props., LLC v. BP Prod. N. A., Inc., 277 F. App'x 312, 318 (4th Cir. 2008) (quoting Chesterfield Meadows Shopping Ctr. Assocs., L.P. v. Smith, 568 S.E.2d 676, 680 (Va. 2002)). Carmeuse contends that the "essential objects and purposes" of the Yard Restriction are stated expressly in the deed: "to protect the family of the said Reynolds and of his heirs or assigns, or other persons who may be in the occupancy of the house, from annoyance." See 1849 Deed, Docket No. 1-1. Carmeuse argues that the circumstances have radically changed: the stone building has been uninhabited for many years, it is in disrepair, and it is without water or electricity to support occupancy. Furthermore, zoning regulations prohibit the use of the stone structure as a residence. See Dep. of Justin Thomas at 107. Therefore, according to Carmeuse, there are not and there cannot be any persons to protect from annoyance.

The court believes that this argument is nearly identical to the argument that the Yard Restriction is void under the doctrine of repugnancy, which the Fourth Circuit summarily rejected when the matter was appealed. The Fourth Circuit stated,

> Nor is the Yard Restriction void simply because the house on the Property is not currently being used as a residence. . . . Nothing in [the deed] language suggests that the parties intended for the Yard Restriction's protections to be conditional upon the house being used as a residence. Moreover, it makes little sense to suggest that temporary conditions such as the Property's current zoning . . . could permanently deprive them of the rights to which they were entitled when they purchased the Property's surface estate.

7

Thomas, 642 F. App'x at 260-61. Accordingly, the court believes that neither the zoning regulations or current lack of occupancy have rendered the circumstances so fundamentally changed so as to destroy the essential purpose of the Yard Restriction: "protect[ion] . . . from annoyance." 1849 Deed, Docket No. 1-1. It also appears to the court that if a zoning regulation could not deprive plaintiffs of their rights, it would be inconsistent to find that the state of disrepair of the stone house, also a "temporary condition[]," would mean that circumstances had so radically changed that plaintiffs' rights are not enforceable. Thomas, 642 F. App'x at 260. Therefore, the court does not believe that the Yard Restriction is unenforceable due to the doctrine of changed circumstances.

## II. Ambiguity of the 1849 Deed

Second, Carmeuse argues that there are at least three reasons why the reservation contained in the Yard Restriction is ambiguous and renders the Yard Restriction invalid. First, the deed is silent as to the location of the house. Second, the deed does not specify the location or size of the Yard. Third, Carmeuse asserts that the Access Provision compromises the use of the Yard to the point of making the Yard Restriction meaningless. These three facts together, Carmeuse asserts, make it unlikely that the contracting parties could have determined what was being reserved in the Yard Restriction.

A deed must provide "such a description of the property intended to be conveyed . . . [to] sufficient[ly] . . . identify it with reasonable certainty." See Chesapeake Corp. of Va. v. McCreery, 216 S.E.2d 22, 25 (Va. 1975). When a deed is ambiguous, it is appropriate to consider extrinsic evidence to demonstrate the intent of the parties. Id. "Where a contract is ambiguous and evidence of the surrounding circumstances supports conflicting interpretations,

8

the meaning of the contract 'becomes a mixed question of law and fact' to be submitted to the jury."[4] Plum Creek Timberlands, L.P. v. Yellow Poplar Lumber Co., Inc., No. 1:13CV00062, 2016 US Dist. LEXIS 160930, at *11-12 (W.D. Va. Nov. 21, 2016) (citing Fulton v. Henrico Lumber Co., 148 S.E. 576, 577 (Va. 1929)); see also Goodman, 7 F.3d at 1126 ("If . . . resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.").

Here, the fact that the 1849 Deed grants access rights and does not specify the location or size of the Yard is extrinsic evidence relevant to the proper interpretation of the deed. The court believes that a reasonable jury could, as Carmeuse asserts, find that the imprecision of the 1849 Deed makes it sufficiently ambiguous so that even Reynolds and Wilson would not have been able to identify what the 1849 Deed grants and what it reserves in relation to the Yard. See Smith v. Bailey, 127 S.E. 89, 93 (Va. 1925) ("A deed . . . must so describe . . . the property conveyed as to afford the means . . . of ascertaining with accuracy what is conveyed . . . ."). In that instance, the rules of construction require that the deed be construed strictly in favor of the grantee. See Bostic v. Bostic, 99 S.E.2d 591, 597 (Va. 1956) ("[W]here the language of the deed is ambiguous its provisions should be construed most strongly against the grantor and in favor of the grantee. . . . The same rule of interpretation applies in determining the nature and extent of the . . . right reserved to the grantor.").

Conversely, a reasonable trier of fact could determine that the lack of specificity and grant of access rights have no such effect, and that the existence of the Yard was known by

---

[4] In this case, neither side demanded a trial by jury. However, at an early point in the post-remand proceedings, the court indicated that it intended to empanel an advisory jury to address any factual issues that survived summary judgment. See Fed. R. Civ. P 39(c). At the summary judgment hearing, the parties indicated a willingness to be bound by a jury verdict.

9

Reynolds and Wilson with such specificity to permit enforcement of the Yard Restriction at the time the 1849 Deed was executed. In that instance, the remaining questions would be identification of the location and size of the Yard, if possible, and what rights of access Carmeuse possesses, if any.[5] Therefore, because the language of the 1849 Deed and the circumstances surrounding the Yard Restriction give rise to conflicting interpretations, summary judgment on this issue is inappropriate.

### III. Location and Size of the Yard

Third, Carmeuse argues that there is no issue of material fact as to the location of the Yard. As discussed, the 1849 Deed's ambiguous provisions is a circumstance that may support a finding that the Yard Restriction is unenforceable. However, should a jury conclude that otherwise, there remains a factual question as to what is the location and size of the Yard. If this fact is in dispute, it is properly submitted to the jury. See Blackburg Mining & Mfg. Co. v. Bell, 100 S.E. 806, 809 (Va. 1919) ("[T]he location of the land embraced in the deed [is] within the province of the jury."). Here, Carmeuse asserts that it has forecast undisputed evidence that Reynolds' dwelling and surrounding Yard cannot be on the Property. If the stone house is not on the Property, then there is no Yard to protect, and judgment must be entered in favor of the defendants. In support of its argument, Carmeuse relies upon two of its experts: Charles McMurry, Jr., a land surveyor, and Dr. Kenneth Koons, a historian.

---

[5] Sometime after the hearing on Carmeuse's second motion for summary judgment, Carmeuse filed a motion for leave to file a counterclaim, seeking a declaration of its rights of ingress, egress, and regress onto the Yard. See Carmeuse Countercl. ¶ 14, Docket No. 293-1. Stated succinctly, Carmeuse is requesting a determination of the legal effect of the Access Provision as it relates to the Yard Restriction. The court intends to grant Carmeuse's motion for leave to file a counterclaim in a separate order to be entered forthwith. However, the court does not intend to submit this issue to the jury at the upcoming trial on the Thomases' complaint. Accordingly, in the event that the jury finds that the Yard Restriction is enforceable and can determine the location and size of the Yard, the court will then consider the issue advanced in Carmeuse's counterclaim as a matter of law. See Bossieux v. Shapiro, 153 S.E. 667, 669 (Va. 1930) (noting that the legal effect of the instrument is a question of law for the court, absent ambiguity that cannot be remedied by extrinsic evidence).

10

McMurry opines that it is "likely not possible to determine the location of the area referred to in the Yard Restriction" and that the "stone structure currently on the Property is likely not the 'dwelling house.'" See Affidavit of Charles McMurry, Jr., Docket No. 143-1 ¶ 19. McMurry references the Confederate Map, noting that the marking where the stone house now stands is specifically labeled as a "cabin." Id. The marking denoting a structure on the eastern side of Rocky Point Road, McMurry contends, refers to a "dwelling." See id. ¶ 19-20. Carmeuse believes that this second house is where the present day "Newcomb House" is located. Carmeuse's expert asserts that the Newcomb House may have been Reynolds' dwelling. Preliminary Expert Report of Charles McMurry, Docket No. 171-1 at 8.

Dr. Koons opines that it "is impossible to determine the location of the Yard" as it has "not survived in either the historical record or the physical location." Affidavit of Kenneth Koons, Docket No. 143-6 ¶ 7. Dr. Koons also observes that he could not "determine whether the 'stone house' referenced in the [1849] Deed is the structure currently standing on the property owned by Justin and Irene Thomas." Id. at ¶ 8. Instead, Dr. Koons believes "that it is likely another structure [that] is the dwelling house referred to in the [1849] Deed." Id. at ¶ 11. Carmeuse's experts further note that the later deeds refer to Reynolds' dwelling as a "mansion," that the wealthy Reynolds family would likely not be able to comfortably live in the house located on the Property, and that the house is oddly built with two fireplaces. See Preliminary Expert Report of Charles McMurry, Docket No. 171-1 at 8; McMurry Affidavit, Docket No. 143-1 ¶ 19-21; Koons Affidavit, Docket No. 143-6, ¶ 7-11. Carmeuse urges the court to find that, from this evidence, no reasonable jury could reach a verdict in plaintiffs' favor.

11

In response, plaintiffs forecast evidence suggesting that there are genuine issues of material fact, first, as to whether the stone house that is currently on the property is the "dwelling" referenced in the 1849 Deed and, second, as to the size and location of the Yard. Relying on their own experts, plaintiffs present evidence demonstrating that the stone house currently on the Property dates from the eighteenth century and was used as a dwelling in the nineteenth century. See Report of Daniel Thorp, Docket No. 246-14 at 1. Moreover, a two-story frame house was built adjacent to the stone house in the nineteenth century, combining the stone house into a larger structure. See Supplemental Report of Daniel Thorp, Docket No. 246-15 at 1. Plaintiffs argue that the Reynolds family could have lived comfortably in this combined structure. Dr. Thorp further reports that the masonry work within the stone house indicates that the owner was a wealthy individual. Id.

Additionally, plaintiffs present a document from Botetourt County that suggests that what is known as the "Newcomb House" was not built until 1880. See Unofficial Property Record Card, Docket No. 246-8. Therefore, plaintiffs argue that it is not possible that the Newcomb House is the "dwelling" referred to in the 1849 Deed. As to the later deeds which refer to Reynolds' dwelling as a "mansion," plaintiffs note that the deed conveying what is now the Property from Reynolds to his wife describes the Property as "on which [Reynolds] now reside[s], with the mansion house." Report of Daniel B. Thorp, Docket. No. 246-14 at 1. Plaintiffs believe that this language, read together with the surveyor's plat, which states that "this portion [given to Reynolds' wife] includes the stone house," demonstrates that the stone house was Reynolds' "mansion."

Plaintiffs also address Carmeuse's contention that the Confederate Map makes a distinction between "cabins" and "dwellings." The legend accompanying the Confederate Map

Case 7:12-cv-00413-GEC Document 306 Filed 03/31/17 Page 12 of 15 Pageid#: 5428

suggests that the square demarking the "cabin," where the stone house now sits, is the same type of square mark that is used to denote a "dwelling." See Docket No. 168-12. Plaintiffs also argue that a second easement provision in the 1849 Deed supports the proposition that the stone cabin is the "Reynolds dwelling" mentioned in the 1849 Deed. This easement runs "from the Rocky Point Road above said Reynolds' dwelling house . . . and coming out into the Rocky Point Road near a house in which Daniel D. Davidson recently lived." 1849 Deed, Docket No. 1-1. Looking at this easement provision and the Confederate Map, plaintiffs contend, it becomes clear that the Confederate Map "cabin," which is just beneath Rocky Point Road, the dwelling house mentioned in the 1849 Deed, and the current stone house are one in the same. Furthermore, plaintiffs' expert concludes, "[T]here is no question that the surviving stone house, either by itself or incorporated into a larger structure, was the dwelling house referred to in the 1849 Deed." Supplemental Report of Daniel Thorp at 1, 246-15.

As to the location of the Yard in relation to the location of the "Reynolds' dwelling," plaintiffs assert that once the house is accepted as the Reynolds' dwelling, the definable area of the Yard is simply a disputed factual issue. "A deed conveying land must give such a description of the property intended to be conveyed as will be sufficient to identify it with reasonable certainty." Chesapeake Corp., 216 S.E.2d at 25. "The same principle is applicable to the description excepting or reserving certain property from the operation of a conveyance." Id. "[A]ll that is required of a deed is to furnish a means of identification . . . ." Blair v. Rorer's Administrator, 116 S.E. 767, 778 (Va. 1923) "[I]f the description is sufficient when the deed is made, no subsequent change in conditions can render it insufficient." Id. A description is sufficient if it "afford[s] the means, with the aid of extrinsic evidence, of ascertaining with

13

accuracy what is conveyed and where it is." Firebaugh v. Whitehead, 559 S.E.2d 611, 615 (Va. 2002) (quoting Smith, 127 S.E. at 93).

Here, plaintiffs argue that the parties to the 1849 Deed would have known the boundaries of the Yard. Carmeuse's expert states that the area would have been fenced and attached to the house. See Report of Kenneth Koons at 8, Docket No. 246-26. Additionally, Carmeuse's expert opines that nineteenth century houses would commonly have an enclosed yard, extending fifty to seventy feet in every direction from the house. Id. at 9. Similarly, plaintiffs' expert observes that the land surrounding the stone house contains cleared fields, a fresh spring, and foundations of numerous outbuildings. Report of Daniel Thorp, Docket No. 246-14 at 1. Moreover, it is the only area on the Property with a farmhouse complex. From this information, plaintiffs' expert opines that the yard would include the farmhouse, 185 yards away from the stone house, and the cemetery, 150 yards away from the stone house. Id. Accordingly, given the competing expert testimony, plaintiffs believe that there is a genuine issue of material fact as to the size and location of the Yard. The court agrees.

At the summary judgment stage, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Here, both parties have relied heavily on experts, in addition to other contemporaneous documents. The evidence sets up a classic "battle of the experts," which is generally not appropriate to resolve at summary judgment. See Reyazuddin v. Montgomery Cty., 789 F.3d 407, 417 (4th Cir. 2015). A reasonable jury could credit either expert, or chose to find both unreliable and instead make factual determinations based upon the conflicting evidence presented, such as the Confederate Map, the county records about the Newcomb House, and other exhibits. In sum, from the evidence before it, the court believes that there are genuine

14

issues of material fact warranting jury consideration as to (1) whether the 1849 Deed, with its Access Provision and lack of specificity regarding the Yard, is too ambiguous to provide plaintiff with the ability to enforce the Yard Restriction; and (2) whether it is possible to determine the size and location of the Yard; and (3) what are the boundaries of the Yard, if possible to determine. Upon a jury determination of these issues, the court will proceed to declaring Carmeuse's rights of ingress, regress, and egress, if necessary.

## Conclusion

For the reasons stated, Carmeuse's motion for summary judgment will be denied. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 30th day of March, 2017.

_____
Chief United States District Judge